IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

EDWARD KRUSCH,                     )
                                   )
            Plaintiff,             )
                                   )
      v.                           )        1:14cv116
                                   )
TAMKO BUILDING PRODUCTS, INC.,     )
and ROOFING SUPPLY GROUP-          )
GREENSBORO, LLC,                   )
                                   )
            Defendants.            )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

This is a suit for damages for allegedly defective roofing shingles manufactured by Defendant TAMKO Building Products, Inc. ("TAMKO"), and distributed by Defendant Roofing Supply Group-Greensboro, LLC ("RSG"). Plaintiff Edward Krusch alleges breach of an implied warranty of merchantability, breach of express warranty, unfair and deceptive trade practices, negligent misrepresentation, and violations of the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301 et seq. Before the court is Defendants' motion to stay the case based on an arbitration agreement, or to compel Krusch to arbitrate. (Doc. 14.) For the reasons set forth below, Defendants' motion will be granted.

## I.   BACKGROUND

The facts alleged in the amended complaint and accompanying exhibits are as follows:

Krusch purchased TAMKO Lamarite Slate Composite Shingles ("the Shingles") from RSG for the roof of his personal residence in Greensboro, North Carolina. (Doc. 10 ¶ 9.) He bought one set on June 9, 2008, another on October 10, 2008, and additional ones on other dates. (Doc. 10-1 (RSG invoices attached to amended complaint); Doc. 10 ¶ 9 (alleging that Krusch placed "various orders" and that the two invoices attached "reflect[] certain of these orders").) The Shingles were installed on Krusch's roof "at various times." (Doc. 10 ¶ 10.)

"Soon after" the Shingles were installed,[1] they began to discolor and deteriorate. (Id. ¶ 11.) An express fifty-year limited warranty accompanied the Shingles, which Krusch alleges he did not know about until "later." (Id. ¶¶ 11-13.) Krusch alleges that the Shingles are defective and are in breach of both an implied warranty of merchantability and the express limited warranty. (Id. ¶ 11.)

On May 18, 2012, Krusch sent TAMKO a warranty claim with accompanying documentation, pursuant to the express limited warranty. (Id. ¶ 14.) Six days later, TAMKO denied the claim, stating that Krusch's claims for "color variation and fading" were not covered by the limited warranty and suggesting that the coloration problems may "typically be removed by careful hand

---

[1] Given Krusch's allegation that he installed the Shingles "at various times," it is unclear when he began to notice the problems and whether he continued to purchase the Shingles after noticing the problems.

cleaning." (Doc. 10-2 at 2; Doc. 10 ¶ 15.) Krusch asked TAMKO to reconsider its decision, but TAMKO refused. (Doc. 10 ¶ 16.)

On January 7, 2014, Krusch commenced the present lawsuit in Guilford County (North Carolina) Superior Court, alleging breach of an implied warranty of merchantability, breach of express warranty,[2] unfair and deceptive trade practices, and negligent misrepresentation against TAMKO and RSG. (Doc. 4.) Defendants timely removed the action to this court based on diversity jurisdiction under 28 U.S.C. § 1332.[3] (Doc. 1.) Krusch then filed an amended complaint, adding claims against Defendants for violations of the MMWA. (Doc. 10.)

Defendants now move to stay the action based on an arbitration agreement or, alternatively, to compel arbitration.

---

[2] Krusch's claim for breach of express warranty is asserted only against TAMKO, which issued the fifty-year express limited warranty in dispute.

[3] Defendants' petition for removal states that TAMKO is incorporated and has its principal place of business in Missouri. (Doc. 1 ¶ 2.) It further states that RSG is a Delaware limited liability company whose sole member is a Texas limited liability company, whose sole member is a Delaware corporation with its principal place of business in Texas. (Id. ¶ 4.) Krusch is a resident of North Carolina. (Doc. 4 ¶ 1.) In their removal notice, Defendants state that the invoices Krusch attached to his complaint "show that he paid at least $31,441.38 for TAMKO shingles and related roofing items in 2008." (Doc. 1 ¶ 8.) Indeed, the invoices indicate that Krusch paid at least $26,821.90 for the Shingles alone. (See Doc. 4-1.) Additionally, Krusch is seeking treble damages and attorney's fees. (Doc. 4 at 8; Doc. 10 at 10.) Krusch's amended complaint alleges that the amount in controversy "exceed[s] $75,000." (Doc. 10 ¶ 4.) Although Krusch's state-court complaint did not plead a specific amount of damages, see N.C. Gen. Stat. § 1A-1, Rule 8(a)(2), it is apparent from the invoices, the remedies sought, and the parties' good faith representations that the amount in controversy exceeds $75,000; therefore, this court has jurisdiction.

(Docs. 14, 15.)   Krusch responded (Doc. 16), and Defendants replied (Doc. 17).   The motion is now ripe for consideration.

## II.   ANALYSIS

### A.   FAA

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq., represents "a liberal federal policy favoring arbitration agreements."   Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983).   "When parties have entered into a valid and enforceable agreement to arbitrate their disputes and the dispute at issue falls within the scope of that agreement, the FAA requires federal courts to stay judicial proceedings, and compel arbitration in accordance with the agreement's terms."   Murray v. United Food & Commercial Workers Int'l Union, 289 F.3d 297, 301 (4th Cir. 2002) (citations omitted).

The party seeking to compel arbitration must show (1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision purporting to cover the dispute that is enforceable under general principles of contract law, (3) the relationship of the transaction, as evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect, or refusal of a party to arbitrate the dispute.   Am. Gen. Life & Accident Ins. Co. v. Wood, 429 F.3d 83, 87 (4th Cir. 2005).   In this case, there is no question that a dispute exists between Krusch and Defendants, the dispute

4

falls within the terms of the arbitration provision of the limited warranty, Krusch has not made use of the arbitration procedure set forth in it, and the transactions involved interstate commerce. (Doc. 15 at 5; Doc. 16 at 3 ("Krusch does not contest that the [FAA] would apply in this case if the Court finds [mutual agreement] to arbitrate.").) Krusch argues, however, that he cannot be compelled to arbitrate because he never agreed to the limited warranty as part of the sales transactions.

To determine whether the parties agreed to arbitrate a matter, courts apply relevant state law principles governing the formation of contracts. First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995); see also Allied-Bruce Terminix Cos., Inc. v. Dobson, 513 U.S. 265, 281 (1995) ("States may regulate contracts, including arbitration clauses, under general contract law principles and they may invalidate an arbitration clause upon such grounds as exist at law or in equity for the revocation of any contract.") (citation omitted); Am. Gen. Life & Accident Ins. Co., 429 F.3d at 87 ("[G]enerally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening [the FAA].") (citation omitted). The parties agree that North Carolina law governs this question. (Doc. 16 at 4; Doc. 17 at 2-3 (citing North Carolina cases).) For a valid

contract to exist under North Carolina law, the three elements of offer, acceptance, and consideration must be present. Burley v. U.S. Foods, Inc., 756 S.E.2d 84, 89 (N.C. Ct. App. 2014); see also Snyder v. Freeman, 266 S.E.2d 593, 602 (N.C. 1980) ("[M]utual assent and the effectuation of the parties' intent is normally accomplished through the mechanism of offer and acceptance.").

Here, TAMKO[4] contends that Krusch agreed to the arbitration provision in the limited warranty, even though it is undisputed that neither Krusch nor anyone on his behalf ever signed it. (Doc. 15 at 11.) TAMKO asserts that agreements to arbitrate "need not be signed" to be accepted. (Id. (citing Collie v. Wehr Dissolution Corp., 345 F. Supp. 2d 555, 558-59 (M.D.N.C. 2004); Real Color Displays, Inc. v. Universal Applied Tech. Corp., 950 F. Supp. 714, 717-18 (E.D.N.C. 1997).) TAMKO contends that Krusch agreed to the arbitration provision in the limited warranty because Krusch had notice of the warranty (both personally and through his contractor, Tom Parker), made repeated purchases of the Shingles, and subsequently sued TAMKO, alleging breach of the limited warranty. (Id. at 12-13.) Krusch, on the other hand, maintains that he never knew of the

---

[4] Although Defendants presented a joint motion to stay, TAMKO is the only Defendant claiming an agreement to arbitrate. (Doc. 14.) RSG's motion to stay is premised on "considerations of judicial economy and possible inconsistent results" and is therefore dependent on the success of TAMKO's motion. (Id. ¶ 16.)

limited warranty until he noticed the deterioration of the Shingles, once installed. (Doc. 16-1 ¶ 6.) He contends that because he neither knew of nor signed the limited warranty, he is not bound by the arbitration provision within it. (Doc. 16 at 5-8.)

As a preliminary matter, the lack of Krusch's signature on the limited warranty is not dispositive of whether he agreed to it. Arbitration agreements must be in writing, 9 U.S.C. § 2, but they need not be signed to be enforceable. See Real Color, 950 F. Supp. at 717 (noting no requirement that a written arbitration agreement be signed by the party to be charged); Collie, 345 F. Supp. 2d at 558-59 (concluding that lack of employer's signature did not defeat finding of mutual assent where employee signed agreement containing arbitration provision). The crucial question is whether Krusch agreed to the limited warranty, which included the arbitration provision.

TAMKO has produced evidence that RSG gave Parker, Krusch's contractor, a sample Shingle and accompanying product brochures when he came to RSG in 2008 inquiring about roofing shingles for Krusch's residence. (Doc. 14-6 ¶¶ 4-5.) It is unclear whether the limited warranty appeared in the product brochures, but it is uncontested that the following notice was molded onto each Shingle:

> PURCHASE OF THIS PRODUCT IS SUBJECT TO THE TERMS,
> CONDITIONS AND LIMITATIONS OF A LIMITED WARRANTY WHICH
> IS INCORPORATED INTO THE PURCHASE TRANSACTION.  THERE
> ARE NO OTHER WARRANTIES, EXPRESS OR IMPLIED FOR THIS
> PRODUCT.  FOR A COPY OF THE LIMITED WARRANTY OR THE
> INSTALLATION INSTRUCTIONS, CONTACT YOUR TAMKO
> DISTRIBUTOR.  CALL TAMKO AT 1-800-641-4691, OR VISIT
> WWW.TAMKO.COM.

(Doc. 14-1 ¶ 7.)  After Parker's visit, Krusch purchased Shingles from RSG.  (Doc. 14-6 ¶¶ 6-7.)

TAMKO contends that Parker acted as Krusch's agent during these transactions and that Krusch is therefore charged with what Parker knew.  (Doc. 17 at 2; Doc. 14-6 ¶ 9.)  An agent is one who acts with the authority, either express or implied, of a principal and over whom a principal exerts control.  Holcomb v. Colonial Assocs., L.L.C., 597 S.E.2d 710, 716 (N.C. 2004) (citation omitted).  TAMKO has produced evidence that Parker identified himself as Krusch's building contractor to Scott Becraft, the general manager of RSG, and inquired about purchasing roofing shingles for use on Krusch's house, which Krusch himself purchased soon after.  (Doc. 14-6 ¶¶ 4-7.) Becraft states that he understood Parker to be acting as Krusch's agent during the transaction.  (Id. ¶ 9.)  Krusch has not disputed that Parker was indeed his contractor or that any of Becraft's affidavit is untrue.  He only contends that Parker never informed him of any limited warranty or gave him application instructions or product literature.  (Doc. 16 at 2.)

Yet the unrebutted evidence that Parker acted as Krusch's agent – at least for purposes of investigating roofing choices – necessarily means that information Parker learned in the course of his duties as agent can be imputed to Krusch. See <u>Norburn v. Mackie</u>, 136 S.E.2d 279, 285 (N.C. 1964) ("[A] principal is chargeable with, and bound by, the knowledge of or notice to his agent received while the agent is acting as such within the scope of his authority and in reference to a matter over which his authority extends, although the agent does not in fact inform his principal thereof.") Krusch is charged with knowledge of the limited warranty notice molded into the sample Shingle, which Parker received before the purchases were made, even if Krusch was not informed of it.

The notice on the Shingle stated that the purchase of that Shingle was subject to a limited warranty, which was expressly incorporated by reference into the purchase transaction. (Doc. 14-1 ¶ 7.) North Carolina law allows such incorporation by reference; parties are bound to the incorporated agreement as if it had been set out in full in the primary agreement. <u>Schenkel & Schultz, Inc. v. Hermon F. Fox & Assocs., P.C.</u>, 658 S.E.2d 918, 921-22 (N.C. 2008) (quoting <u>Booker v. Everhart</u>, 240 S.E.2d 360, 363 (N.C. 1978) ("To incorporate a separate document by reference is to declare that the former document shall be taken as part of the document in which the declaration is made, as

much as if it were set out at length therein.")  Thus, the court finds that Krusch, having constructive notice of the limited warranty, which included an arbitration provision, agreed to purchase Shingles that were expressly subject to that arbitration provision.  This suffices as mutual assent and thus binds Krusch to the agreement to arbitrate.

**B.    MMWA**

Krusch contends that, even if this court finds an agreement to arbitrate, it should deny TAMKO's motion because the MMWA, as interpreted by the Federal Trade Commission ("FTC"), prohibits the enforcement of binding arbitration clauses as the exclusive means of dispute resolution.  (Doc. 16 at 10.)  TAMKO argues that Congress did not intend to preclude binding arbitration when it enacted the MMWA and argues that, although the Fourth Circuit has not spoken directly on this question, well-reasoned decisions from other circuits support this conclusion.  (Doc. 17 at 5-7.)

"Congress enacted the MMWA in response to a swell of consumer complaints regarding the inadequacies of warranties to protect consumers' interests."  Seney v. Rent-A-Center, Inc., 738 F.3d 631, 633 (4th Cir. 2013).  The act is broadly aimed at "improv[ing] the adequacy of information available to consumers, prevent[ing] deception, and improv[ing] competition in the marketing of consumer products."  15 U.S.C. § 2302(a).  It

includes a provision regarding remedies in consumer disputes. Id. § 2310. Under the MMWA, "warrantors may establish an informal dispute settlement procedure." Id. § 2310(a)(3). Congress encourages warrantors to do so, id. § 2310(a)(1), and instructs the FTC to prescribe rules establishing minimum requirements for such an informal procedure, id. § 2310(a)(2). If a warrantor chooses to establish such an informal dispute settlement procedure that meets the FTC's minimum requirements, the warrantor can require an aggrieved consumer to submit to it before commencing a civil action. Id. § 2310(a)(3). If the warrantor either does not have the prescribed informal procedure or the procedure fails to resolve the dispute, the act creates a specific statutory right of action. Id. § 2310(d)(1). Subject to certain conditions, federal district courts have jurisdiction over MMWA claims.[5]

The FTC, the agency charged with promulgating regulations

---

[5] The parties have not raised the issue of jurisdiction over Krusch's MMWA claim for the $26,821.90 Shingles price (which, it appears, does not reach the MMWA's lower jurisdictional threshold of $50,000), probably because as long as Krusch's other claims remain, the court can exercise supplemental jurisdiction over it pursuant to 28 U.S.C. § 1367. See 15 U.S.C. § 2310(d)(3)(B) (lowering amount-in-controversy requirement to "$50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit"); Saval v. BL Ltd., 710 F.2d 1027, 1032-33 (4th Cir. 1983) (holding that the proper construction of § 2310(d)(3) for jurisdictional purposes does not allow for inclusion of attorney's fees); Misel v. Mazda Motor of Am., Inc., 420 F. App'x 272, 274 (4th Cir. 2011) (unpublished) (holding, on the basis of out-of-jurisdiction decisions, that the MMWA's amount in controversy does not include pendent state law claims, including claims for treble damages under state law).

relating to the MMWA, has consistently interpreted § 2310 to prohibit warrantors from requiring a consumer to submit to binding arbitration without first resorting to an informal dispute resolution "mechanism." Seney, 738 F.3d at 633-34 (citing 16 C.F.R. § 703.1 et seq.). As the Fourth Circuit explained, the FTC regulations

> distinguish between so-called "pre-dispute" and "post-dispute" binding arbitration. "Pre-dispute" binding arbitration refers to parties' employment of binding arbitration as the *exclusive* means of resolving disputes, i.e., without first obtaining a nonbinding "mechanism" decision. In general, the FTC regulations prohibit "pre-dispute" binding arbitration. By contrast, the regulations permit "post-dispute" binding arbitration. "Post-dispute" arbitration takes place after parties have first mediated their dispute informally through a nonbinding "mechanism." Thus, under the FTC regulations, if the parties first engage in nonbinding dispute resolution, a warrantor may *then* require a consumer dissatisfied with the "mechanism" decision to submit to binding arbitration.

Id. at 634 (citations and footnotes omitted) (emphasis in original). The key question, then, is whether the FTC's interpretation of § 2310 controls the outcome in this case, as Krusch contends.

Three legal concepts animate the resolution of this question. The first is Congress' well-recognized and enduring policy in favor of arbitration, which courts have applied as a presumption. Moses H. Cone Mem'l Hosp., 460 U.S. at 24-25; Peabody Holding Co., LLC v. United Mine Workers of Am., Int'l Union, 665 F.3d 96, 104 (4th Cir. 2012). The second is the

familiar two-part test from Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), which first asks whether Congress has spoken directly to the precise question at issue, and if it has not, then asks whether the agency's interpretation of the statute is reasonable. The third is a set of three factors established by Shearson/American Express, Inc. v. McMahon, 482 U.S. 220, 227 (1987), to determine whether Congress intended to preclude arbitration of a particular statutory claim: (1) the text of the statute, (2) its legislative history, and (3) whether there is "an inherent conflict between arbitration and the statute's underlying purposes." As the Fourth Circuit has recently noted, "[t]he way in which Chevron squares with McMahon . . . is uncertain, and courts have divided on the question." Seney, 738 F.3d at 635.

Thus far, only three circuits have grappled with how these three legal concepts interact in determining whether the MMWA permits pre-dispute binding arbitration of written warranty claims. In 2002, the Fifth Circuit applied the presumption favoring arbitration and the three McMahon factors to answer Chevron's preliminary question: has Congress spoken directly to the issue? Walton v. Rose Mobile Homes LLC, 298 F.3d 470, 475-78 (5th Cir. 2002). Walton held that "the text, legislative history, and purpose of the MMWA do not evince a congressional intent to bar arbitration of MMWA written warranty claims." Id.

13

at 478. Therefore, the court found that "[t]he clear congressional intent in favor of enforcing valid arbitration agreements controls," and there was no need to proceed to the second prong of Chevron and determine whether the FTC's interpretation of the MMWA was reasonable. Id.; id. at 478 n.14. According to the court, the MMWA does not prohibit warrantors from requiring consumers to submit to binding arbitration.[6] Id. at 479. The decision was not unanimous. In dissent, Judge King concluded that the MMWA failed to directly speak to whether binding arbitration clauses in written warranties are enforceable and that the FTC's interpretation was entitled to deference as reasonable. Id. at 492.

Less than two months later, the Eleventh Circuit also confronted this question. In Davis v. Southern Energy Homes, Inc., 305 F.3d 1268 (11th Cir. 2002), the court first acknowledged the presumption in favor of arbitration, id. at

---

[6] The court noted that the issue previously divided state and federal courts, with some courts, mostly federal trial courts, reaching a contrary conclusion. Id. at 478 n.16 (including Browne v. Kline Tysons Imports, Inc., 190 F. Supp. 2d 827 (E.D. Va. 2002); Pitchford v. Oakwood Mobile Homes, Inc., 124 F. Supp. 2d 958 (W.D. Va. 2000)). However, one of the earliest and primary opinions invalidating such arbitration clauses in the MMWA context that courts relied on, Wilson v. Waverlee Homes, Inc., 954 F. Supp. 1530 (M.D. Ala. 1997), aff'd without opinion, 127 F.3d 40 (11th Cir. 1997), was later abrogated by Davis v. Southern Energy Homes, Inc., 305 F.3d 1268 (11th Cir. 2002). Indeed, the Alabama Supreme Court, which had originally reached the same conclusion as Wilson, see S. Energy Homes, Inc. v. Lee, 732 So.2d 994 (Ala. 1999), reversed itself for the thoughtful and persuasive reasons stated in Justice See's thorough dissent in Lee, see S. Energy Homes, Inc. v. Ard, 772 So.2d 1131, 1135 (Ala. 2000).

14

1272-73, and then analyzed the McMahon factors, determining that
the text, legislative history, and purpose of the MMWA
demonstrated no congressional intent to bar binding arbitration,
id. at 1273-77. Rather than apply the presumption in favor of
arbitration to find that Congress had spoken directly on the
issue – as the court acknowledged Walton did, id. at 1278 n.6 –
the Eleventh Circuit found congressional intent to be unclear,
and so proceeded to step two of Chevron. Id. at 1278. The
court held that the FTC's interpretation of the MMWA was
unreasonable because its motives and reasoning, outlined in its
regulations, were contrary to Supreme Court precedent:

> In the legislative regulations, the FTC bases its
> construction on Congress' grant of concurrent
> jurisdiction. [However], a statute's provision for a
> judicial forum does not preclude enforcement of a
> binding arbitration agreement under the FAA. Thus,
> the FTC's motive behind the legislative regulation is
> contradictory to Supreme Court rationale, and we
> conclude that its interpretation is unreasonable. . .
> . [Additionally, the FTC expresses a] major concern
> that an arbitral forum will not adequately protect the
> individual consumers. The Supreme Court in McMahon,
> however, rejected this same hostility shown by the
> [Securities and Exchange Commission]. Instead, the
> Supreme Court holds that arbitration is favorable to
> the individual.

Id. at 1279 (citations omitted). For these reasons and others,
the Eleventh Circuit declined to defer to the FTC's
interpretation and concluded that the MMWA did not prohibit
binding arbitration. Id. at 1280.

Nearly a decade later, in 2011, the Ninth Circuit addressed the same question. In _Kolev v. Euromotors West/The Auto Gallery_, the court began with _Chevron_, found at step one that Congress had not directly spoken to the precise question, and held at step two that the FTC's construction of the MMWA was reasonable. 658 F.3d 1024, 1025-29 (9th Cir. 2011). The court explicitly rejected the Fifth and Eleventh Circuits' reasoning for three reasons: (1) courts should not discern congressional intent in "one statute by looking to a prior, less specific statute," i.e., the FAA, (2) the FTC reaffirmed its statutory interpretation after _McMahon_ and the court was bound by _Chevron_ to defer to that interpretation, and (3) the MMWA differed in critical ways from other statutes that the Supreme Court found did not rebut the pro-arbitration presumption. _Id._ at 1029-31 (citation and internal quotation marks omitted). The court therefore enforced the FTC regulation and rejected the arbitration provision, over a lengthy dissent.

Soon after _Kolev_ was decided, the Supreme Court issued its opinion in _CompuCredit Corp. v. Greenwood_, 132 S. Ct. 665 (2012). _CompuCredit_ did not deal with the MMWA; rather, it involved the Credit Repair Organization Act ("CROA"), 15 U.S.C. § 1679 _et seq._, which differs in several respects from the MMWA.[7]

---

[7] For example, the MMWA explicitly gives the aggrieved consumer a right of action, whereas the Supreme Court ruled that the CROA does not.

However, <u>CompuCredit</u> emphasized that the creation of a statutory right of action does not preclude the availability of binding arbitration:

> It is utterly commonplace for statutes that create civil causes of action to describe the details of those causes of action, including the relief available, in the context of a court suit. If the mere formulation of the cause of action in this standard fashion were sufficient to establish the "contrary congressional command" overriding the FAA, <u>McMahon</u>, 482 U.S. at 226, valid arbitration agreements covering federal causes of action would be rare indeed. But that is not the law.

132 S. Ct. at 670. After discussing <u>McMahon</u> (applying the Racketeer Influenced and Corrupt Organizations Act), <u>Gilmer v. Interstate/Johnson Lane Corp.</u>, 500 U.S. 20 (1991) (applying the Age Discrimination in Employment Act), and <u>Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.</u>, 473 U.S. 614 (1985) (applying the Clayton Act), the Court cited each as evidence that it has "repeatedly recognized that contractually required arbitration of claims satisfies the statutory prescription of civil liability in court." 132 S. Ct. at 671.

---

<u>CompuCredit</u>, 132 S. Ct. at 669-70. Regardless, the Supreme Court reiterated that valid binding arbitration agreements may be enforced where there is a statutory right of action. <u>Id.</u> at 670-71. Another difference reflects the statutes' timing. The CROA was enacted in 1996, during a decade in which arbitration clauses were used more frequently, <u>id.</u> at 672, which bolstered the Court's conclusion that Congress would have spoken more clearly about arbitration in the CROA had it wished to. The MMWA, on the other hand, was enacted in 1974. <u>Walton</u>, 298 F.3d at 474. It is unclear how frequently arbitration clauses were used before 1974, but the FAA, enacted in 1925, had been law for nearly fifty years.

Three months after CompuCredit was issued, but without any reference to it, the Ninth Circuit withdrew its opinion in Kolev. 676 F.3d 867 (9th Cir. 2012). The court cautioned that its earlier opinion "may not be cited as precedent" to any court within its jurisdiction. Id. This withdrawal left Walton and Davis as the only published circuit decisions on the issue.

Finally, in 2013, the Fourth Circuit came close to addressing the question in Seney. It concluded that the FTC had indeed banned "pre-dispute" binding arbitration and noted the divided opinion on whether such a ban was permissible, 738 F.3d at 635 (citing Davis, Walton, and Kolev), but ultimately determined that it "need not enter the fray" because Seney involved a warranty in a *lease*, rather than a warranty in a *sale*, id. The court concluded that the MMWA and the accompanying FTC regulations did not apply to warranties in leases. Id. at 635-38.

Unlike Seney, the present case involves a sales contract under the MMWA and squarely puts the propriety of TAMKO's binding arbitration clause at issue.

After careful consideration, the court agrees with TAMKO that the MMWA does not prohibit enforcement of its provision for binding pre-dispute arbitration of Krusch's written warranty claims. The FAA's "liberal federal policy favoring arbitration" establishes a presumption in favor of enforceability. Moses H.

18

Cone Mem'l Hosp., 460 U.S. at 24-25. As the Supreme Court noted in McMahon, which was decided after Chevron, in order to overcome this presumption, one opposing arbitration bears the burden of demonstrating that "Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue" through a contrary congressional command. McMahon, 482 U.S. at 227. No such command against "pre-dispute" binding arbitration appears in the text of the MMWA; rather, § 2310 leaves the possibility for such arbitration open. Likewise, Krusch has identified no such command in the legislative history, nor has he demonstrated that application of the FAA would result in an inherent conflict with the MMWA's underlying purposes. See Walton, 298 F.3d at 476-78; Davis, 305 F.3d at 1275-77 (noting instances that the Supreme Court has enforced arbitration of statutory claims where the underlying statutory purposes were, as here, to protect and inform consumers and to address potential inequality of bargaining power of the parties). The MMWA's silence on the point cannot create an ambiguity in light of Congress' unequivocal support of arbitration generally. See Walton, 298 F.3d at 478. The court finds Walton's reasoning on these issues persuasive. With congressional intent sufficiently clear, Chevron's second step – consideration of the agency's interpretation of the MMWA – is unnecessary.

The FAA was meant to "place arbitration agreements on the same footing as other contracts." EEOC v. Waffle House, Inc., 534 U.S. 279, 289 (2002) (citing Gilmer, 500 U.S. at 24). Krusch's contention that the MMWA's grant of a private right of action counsels against enforcement of the arbitration provision is unpersuasive. As noted above, the Supreme Court has repeatedly, and even recently in CompuCredit, reaffirmed the presumption of arbitrability in the presence of a statutory right of action, such as that provided for in the MMWA, on the grounds that binding arbitration is generally understood as a substitute for filing a lawsuit, not a prerequisite. See Mitsubishi Motors, 473 U.S. at 628.

Accordingly, the court concludes that the MMWA does not preclude binding pre-dispute arbitration of claims pursuant to a valid written arbitration agreement, which the court must enforce pursuant to the FAA absent proof of grounds in law or equity preventing it. See 9 U.S.C. § 2. Because Krusch has raised no other objection to the arbitration provision, the court will enforce it and grant the motion to stay the action against TAMKO for arbitration of his claims.

### C.   Claims Against RSG

Because Krusch's claims against RSG are not subject to the limited warranty and therefore not subject to an arbitration provision, not all claims in this action are arbitrable and

dismissal is not an appropriate remedy.  Cf. Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc., 252 F.3d 707, 709-10 (4th Cir. 2001) ("[D]ismissal is a proper remedy when all of the issues presented in a lawsuit are arbitrable.").  But, to promote judicial economy and avoid confusion and possibly inconsistent results, all claims in this action should be stayed pending the outcome of the arbitration between Krusch and TAMKO. See Am. Home Assurance Co. v. Vecco Concrete Constr. Co., Inc. of Va., 629 F.2d 961, 964 (4th Cir. 1980).  Krusch does not contest that the stay, if issued, should extend to all claims. (Doc. 16 at 17.)  Therefore, the court will stay Krusch's claims against RSG as well pending resolution of the arbitration.

**III. CONCLUSION**

For the reasons stated, the court finds that Krusch agreed to arbitrate his claims against TAMKO pursuant to the arbitration provision in the express limited warranty and that the MMWA does not preclude enforcement of that arbitration agreement.  The court further finds that the entire action should be stayed pending resolution of the arbitration between Krusch and TAMKO.

IT IS THEREFORE ORDERED that Defendants' motion to stay (Doc. 14) is GRANTED and that this case is STAYED pending further order of the court.  The parties shall file a joint

report of arbitration every ninety (90) days.  Failure to file such reports may result in dismissal of the action.

     /s/   Thomas D. Schroeder
     United States District Judge

July 23, 2014